**UNITED STATES of America,**

v.

**Samuel Joseph MELVILLE, John David Hughey, III, Jane Lauren Alpert, and Patricia Elizabeth Swinton, Defendants.**

**No. 70 CR. 28 (MP).**

United States District Court,
S. D. New York.

March 3, 1970.

See also D.C., 309 F.Supp. 745.

Lefcourt, Garfinkel, Crain, Cohn, Sandler & Lefcourt, New York City, for defendants Melville and Hughey;. by William E. Crain and Frederick H. Cohn, New York City, of counsel.

Sanford M. Katz, New York City, for defendant Alpert.

Whitney North Seymour, Jr., U. S. Atty. for the Southern District of New York, for plaintiff; by John H. Doyle, III, and John R. Wing, New York City, of counsel.

## OPINION

### (Motions to Dismiss)

POLLACK, District Judge.

The defendants are charged herein with conspiracy and substantive offenses under the laws against injury of federal property, use of explosive bombs, sabo-

tage and destruction of national defense utilities, possession of illegally made explosive bombs.

The defendants are here attacking those counts of the indictment stemming from the recently enacted Gun Control Act of 1968 which amended Title IV of the Omnibus Crime Control and Safe Streets Act. P.L. 90–351, Title IV, § 902, 82 Stat. 226, as amended, P.L. 90–618, 82 Stat. 1213, 18 U.S.C.A. § 921 et seq. (Supp. 1970).

1. *Interstate Commerce*

The counts of the indictment (3, 5, 9, 10, 11) which charge use of explosive bombs by some or all of the defendants to commit federal felonies, fail to allege that the bombs were unlawfully transported into or received in New York by such defendants in the course of interstate or foreign commerce. These defendants claim that the use, without more, of an explosive bomb, even if it is used in the commission of a federal crime, is not sufficient to constitute a crime under the statute, Title 18 § 924(c) (1) and (c) (2).

■ It is crystal clear however, from the legislative history of the section that Congress intended to make the use of a destructive bomb to commit a federal felony a crime irrespective of any nexus between the bomb and interstate or foreign commerce.

The statute is embodied in a chapter of the Criminal Code entitled "Firearms". By definition in the chapter, the term firearm means any destructive device which in turn is defined as any explosive bomb. 18 U.S.C. § 921(a) (3) and (4).

Section 924(c) (1) and (2) defines the crime charged in counts 3, 5, 9, 10 and 11. This section reads as follows:

(c) Whoever—

(1) uses a firearm to commit any felony which may be prosecuted in a court of the United States, or

(2) carries a firearm unlawfully during the commission of any felony which may be prosecuted in a court of the United States,

commits an offense punishable in the manner set out in the remainder of the section.

On June 19, 1968, the President signed the Omnibus Crime Control and Safe Streets Act, Pub.L. 90–351, 82 Stat. 197 which was thereby enacted into law.

Title IV sought to control the purchase and transfer of firearms. To that end, extensive licensing and registration provisions were enacted, along with provisions making it unlawful to sell firearms to certain classes of people. Title IV, § 902 et seq. became known as the Gun Control Act of 1968. 18 U.S.C.A. § 921 et seq. (Supp.1970).

Title VII of the Omnibus Act governs the unlawful possession or receipt of firearms by various classes of persons —convicted felons, mental incompetents, etc. 18 U.S.C.A. § 1201 et seq. (Supp. 1970).

Titles IV and VII were enacted by Congress in part as a reaction to the assassinations of President Kennedy, Senator Robert Kennedy, Dr. Martin Luther King, Jr., and Medgar Evers.

There is no doubt that among the evils sought to be combatted by Title IV, was commercial mail-order traffic in firearms. The state gun control laws were ineffective because of interstate, nonresident purchases of firearms for criminal purposes. The licensing and registration provisions were enacted to strengthen federal controls over interstate and foreign commerce in firearms in order to assist state regulation of firearm traffic within state borders. 1968 U.S.Code Cong. & Adm.News, at 2112–14, 2166 (S.Rep.No.1097).

As it was originally enacted in June, 1968, § 924 of the Gun Control Act contained only three subsections. Subsections (a) and (b) were identical to the present subsections (a) and (b). Subsection (c) was relettered (d) and modified somewhat.

What is presently subsection (c) of § 924 was an amendment to the Gun Control Act, added on October 22, 1968 by

Pub.L. 90–618, Title I, § 102, 82 Stat. 1223. Its provisions were not part of the original Act.

The following is the history of § 924(c) in its passage through the Congress.

On July 17, 1968 (approximately one month after the passage of the Gun Control Act) Mr. Casey introduced an amendment to H.R. 17735 (a bill introduced by Mr. Celler on June 10, 1968 basically to tighten some of the Gun Control legislation which was signed several days later by the President).

This amendment enumerated certain serious felonies [robbery, assault, murder, rape, burglary, kidnapping or homicide (other than involuntary manslaughter)] and made it a federal crime to "use or carry any firearm which had been transported in interstate or foreign commerce" during the commission of one of the enumerated felonies. 114 Cong.Rec., 90th Cong., 2d Sess. 21765–67 (1968).

Questions were raised about the burden to be placed on the federal courts and the prosecutors by this proposed amendment which would make a federal crime out of the use of a firearm during the commission of state felonies. See, 114 Cong.Rec. at 21770–71, 21778. Hon. Ramsey Clark, then Attorney General, was of the view that such a statute would create serious administrative problems for prosecutors and the courts, and that the federal interest in these essentially local crimes was not great. Moreover, state penalties for the commission of these crimes fulfilled the deterrent purposes of legislation, and the existence of an additional federal offense would not be likely to deter criminal conduct. 114 Cong.Rec. at 21778–9.

Mr. Casey urged that Congress had the power to enact such a statute because of the effect on interstate commerce. 114 Cong.Rec. at 21781, 21793. Counsel for the Judiciary Committee likewise thought the commerce power provided a more than adequate jurisdictional basis for the proposed amendment. See, 114 Cong.Rec. at 21826–27.

Mr. Wyman (114 Cong.Rec. at 21793) queried whether Mr. Casey had ever considered limiting the application of the statute to federal offenses so that "then it would not be necessary to say that the gun had to be transported in interstate commerce". Mr. Casey was of the view that there would be no need to prove any connection with interstate commerce to support federal jurisdiction under his proposal.

Eventually, Mr. Wyman introduced a substitute to limit the bill to crimes "constituting a felony by Federal law". 114 Cong.Rec. at 21802. Mr. Minishall proposed the same thing, adding that "whoever uses a firearm in the commission of a *federal* felony" (emphasis added) would be liable for additional punishment. 114 Cong.Rec. at 21803.

On July 19, 1968, Mr. Poff introduced a substitute amendment for the Casey amendment in the language which now appears as § 924(c) (1) and (2) of Title 18. 114 Cong.Rec. at 22231.

The purpose of the Poff amendment was "to persuade the man who attempted to commit a federal felony to leave his gun at home". 114 Cong.Rec. at 22231.

Mr. Poff explained the reason for omitting state felonies from the scope of his amendment (Cong.Rec. at 22231):

First, I do not want to put upon the Federal prosecutor the evidentiary burden of proving that the firearm moved in interstate commerce in order to establish Federal jurisdiction in each individual case. Every federal felony defined in the code already has its own jurisdictional base.

The other reasons which he gave, were, the terrible burden that inclusion of state felonies would put upon the case load of the federal investigative and prosecutive apparatus; and the policy questions in converting state crimes into federal offenses on such a massive scale. 114 Cong.Rec. at 22231. See also remarks of Mr. Celler at 22235.

778

Further debate on the relative merits of the Poff and Casey amendments centered on the amount of penalty and whether it should be mandatory. The House eventually passed the Poff amendment. 114 Cong.Rec. at 22248. It was enacted into law on October 22, 1968 as part of Pub.L. 90–618, 82 Stat. 1213.

It seems incontrovertible that Congress intended that allegations and proof would not be necessary regarding interstate or foreign commerce to charge the offense defined in § 924(c) (1) and (2) of Title 18.

■ No constitutional attack is here made on the power of Congress to enact such a statute. At all events, it is clear that jurisdiction over federal felonies provides a sufficient jurisdictional basis for § 924(c).

2. *Multiplicity of Counts*

Defendants Melville, Alpert and Hughey move to dismiss counts 6–8 and 9–11 of the indictment on the grounds that they are multiplicitous or alternatively, to require that the government elect to charge only two offenses and not six.

Counts 6–8 charge the defendants with an attempt to injure and destroy three United States Army trucks with intent to interfere with and obstruct the national defense of the United States.

The attempt to place a bomb in each truck is made the subject of a separate count.

Counts 9–11 charge the defendants with using explosive bombs to commit the felonies charged in counts 6–8.

The problem raised by defendants' motion centers around the concept of the allowable unit of prosecution.

The approach of the Supreme Court to this question has changed over the years.

Originally, the test of the allowable unit of prosecution was the following:

The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately.

* * * If the latter, there can be but one penalty. Wharton's Criminal Law, 11th ed., § 34, n. 3, quoted with approval in Blockburger v. United States, 284 U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1932).

Additionally, Wharton stated that

when the impulse is single, but one indictment lies, no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie. *Blockburger, supra,* at 302, 52 S. Ct. at 181.

In *Blockburger,* two sales, of separate quantities of drugs, although consummated within a short time of each other, were held to constitute two separate offenses, and not one continuing offense. "The next sale was not the result of the original impulse, but of a fresh one— that is to say, of a new bargain". *Blockburger,* at 303, 52 S.Ct. at 181.

The *Blockburger* court cited with approval the case of Ebeling v. Morgan, 237 U.S. 625, 35 S.Ct. 710, 59 L.Ed. 1151 (1915) where the accused was convicted of wilfully tearing mailbags with intent to rob. The Court held that although the "transaction of cutting the mail bags was in a sense continuous, the complete statutory offense was committed every time a mail bag was cut in the manner described, with the intent charged". Congress so intended, said the Court in *Ebeling,* at 629, 35 S.Ct. 710, 711.

More recently the Supreme Court has disregarded the elusive concept of single impulse as against separable impulses and has sought to determine what the allowable unit of prosecution is, solely by interpreting Congressional intent.

The defendants' position here is briefly this: If the intent of Congress is at all clear, it must be that Congress did not intend that every item of "national-defense material" or "national-defense utility" could be a separate unit of prosecution; and that the intent of Congress was to protect the national defense and

not every object which a person set out to destroy; that at the very least, the intent of Congress is unclear and therefore this Court must follow the approach of the Supreme Court and resolve any ambiguity in favor of lenity, i.e., "doubt will be resolved against turning a single transaction into multiple offenses". Bell v. United States, 349 U.S. 81, 84, 75 S. Ct. 620, 622, 99 L.Ed. 905 (1955). .

The government in the case at bar has charged the defendants with attempting to place three separate bombs in three separate vehicles.

While Congress may have the power to provide punishment for injuring each separate utility on a fact pattern similar to the one in the case at bar, Congress was certainly ambiguous in expressing its intent in the definition of the crime and its components. 18 U.S.C. §§ 2151, 2155 (Supp.1970). In fact no attempt was made to deal with the question of the allowable unit of prosecution.

Is the unit the number of destructive devices?—the number of utilities destroyed plus the amount of national defense materials that might be on these utilities?—or, the single overall act of sabotage?

■ The rule appears to be that where the Court is unable to resolve the ambiguity of congressional intent, where Congress does not fix the punishment for a federal offense clearly and without ambiguity, the principle of lenity must be applied, and all doubt must be resolved against turning a single transaction into multiple offenses. Ladner v. United States, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958); Bell v. United States, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955). .

If there is a choice between differing legislative intents, "before we choose the harsher alternative", we must require "that Congress should have spoken in language that is clear and definite". United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 222, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952).

■ Consequently, the allegations of counts 6, 7 and 8 are to be consolidated into one count charging one offense; and the allegations of counts 9, 10 and 11 are to be consolidated into one count charging one offense. An amended form of these counts as consolidated should be filed herein by the government and this amendment will be without prejudice to the proceedings heretofore had herein in respect to the matters charged.

3. *Statutory Offense Not Charged*

The defendants also move to dismiss counts 6–8 and consequently 9–11 claiming that an essential element of the offense charged is lacking.

The indictment charges, and the statute requires interference with the national defense by injury to vehicles transporting national defense material or "troops of the United States" or vehicles on which such material or such troops may be transported.

■ The defendants contend that the government has made it clear that the trucks were being used by the National Guard and that National Guardsmen whose units are not on active service with the Army are not "troops of the United States" within the meaning of § 2151.

National defense has been defined to be a generic concept referring to the military and naval establishments "and the related activities of national preparedness". See, *infra.* In view of this definition of what constitutes the "national defense" it would indeed be difficult to say that the National Guard—no matter what their relationship to the states in certain matters—is not "related to the national preparedness".

In any event, the indictment charges the defendants with attempting to destroy a truck on which troops of the United States "may have been transported".

The purpose of the statute was to prevent sabotage of utilities vital to the national defense.

Thus, here, if the vehicle was indeed loaned to the National Guard—this does not mean that jurisdiction under the statute is lacking—for the indictment charges, and the government must be allowed a chance to prove, that this was a vehicle on which troops of the United States may be transported. 18 U.S.C. § 2151.

The scienter requirement—that the accused must have intended to interfere with or injure the national defense, cures any fears that one who, for example, blows up an army truck which has been loaned to a farmer might be wrongly accused under this statute of sabotage. He must have intended to interfere with the national defense before the destruction of the utility can bring him under this statute.

4. *Vagueness*

■ The defendants move to dismiss the counts of the indictment which charge sabotage on the grounds that the statute is vague and indefinite. This is addressed to counts 6, 7, 8, 9, 10 and 11.

Counsel for defendants note that the terms "national-defense utilities" and "national-defense material" as defined under § 2151 include myriad items.

For example, the term "national-defense material" would include a "lowly safety pin" says counsel for defendants because this is an article of whatever description which is suitable for the use of the United States in connection with the national defense.

■ The fact that the definitions cover many items does not render the statute vague. If anything, it is explicit, albeit all-encompassing. Defendants do not attack the statute as being overbroad. Moreover, such an attack could not succeed because the section of the statute which defines the crime charged in this indictment, 18 U.S.C. § 2155, requires that the destruction of defense utilities or material be done with intent to injure, interfere with or obstruct the national defense.

Defendants also urge that the statute is unconstitutionally vague because the key term "national defense" is left undefined, and that anything a jury might consider related to the national defense would be criminal conduct under the statute.

■ It is true that the statute omits a definition of "national defense". In 1941 in interpreting the Espionage Act of 1917 the Supreme Court was faced with a similar challenge and held that the Act was not vague. The Supreme Court accepted the definition of "national defense" suggested here again by the government's brief.

National defense, the Government maintains, "is a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." We agree that the words "national defense" in the Espionage Act carry that meaning. Gorin v. United States, 312 U.S. 19, 29, 61 S. Ct. 429, 434, 85 L.Ed. 488 (1941).

The definition of national defense adopted for Espionage is also adopted here for Sabotage.

Given this definition, it cannot be said that the statute:

either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application * * *. Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926)

See Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921).

■ The fact that some conduct might fall in the periphery of interference with the "national defense" does not render the statute unconstitutional on its face:

That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambig-

uous to define a criminal offense. United States v. Petrillo, 332 U.S. 1, at 7, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947).

**5. *Unlawful Possession of Firearms***

■ Counts 12 through 23 charge unlawful possession of 12 explosive bombs. Defendant Melville claims that only one offense can be based on such possession.

It appears clearly that Congress intended to permit separate offenses to be charged for every explosive device made in violation of § 5822—i. e., if the device was made without submitting an application to the Secretary of Treasury, or failing to pay the tax, or failing to secure approval of the Secretary to make and register the firearm. § 5861(f) of Title 26 U.S.C. defines the offense.

Similarly, § 5812 of 26 U.S.C. requires the transferor of a firearm to file an application to transfer it. Section 5861(e) makes it unlawful to transfer a firearm in violation of § 5812. Each transfer of a firearm requires the submission of a separate application, and it seems clear that if 12 firearms are transferred in violation, there are 12 offenses.

So too, as applied to one who possesses a firearm "made in violation of the provisions of this chapter" under § 5861(c). Each firearm constitutes a separate unit.

In Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Court held that Congress intended to prosecute each sale of narcotics made in violation of the order form provisions of the statute, and not a course of conduct. Where there are separable sales, the offenses are separate and distinct.

The Narcotic Act does not create the offense of engaging in the business of selling the forbidden drugs, but penalizes any sale made in the absence of either of the qualifying requirements set forth. Each of several successive sales constitutes a distinct offense, however closely they may follow each

other. *Blockburger*, at 302, 52 S.Ct. at 181.

In this case, the legislative intent to punish for every firearm unlawfully made, transferred or unlawfully possessed, is clear. There is no need to resort to the principle of lenity.

**6. *Self-Incrimination Claim***

■ The government has charged in twelve counts (12–23) that the defendant Melville unlawfully possessed 12 explosive bombs knowing them to have been made in violation of the provisions of 26 U.S.C. § 5801 et seq. The bombs were allegedly made without payment of the tax required by 26 U.S.C. § 5821 and § 5822(b), and without the filing of a written application to make and register the bombs with the Secretary of the Treasury as required by 26 U.S.C. § 5822(a).

Counsel argues that prosecution of the defendant under § 5861(c) for possession of these explosive devices, violates his privilege against self-incrimination. In support of this contention counsel cites Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968); Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).

Congress was well aware of the impact of the *Haynes* decision on the effectiveness of the firearm registration provisions in The National Firearms Act. To remedy the vice of that statute, Congress amended the law with the purpose of eliminating offending provisions. Gun Control Act of 1968, P.L. 90–618, Title II, § 201, 82 Stat. 1227, 26 U.S.C. A. § 5801 et seq. (Supp.1970). The question posed here is whether Congress was successful.

Two District Courts have recently considered the constitutionality of 26 U.S.C.A. § 5861 as applied to one who possesses firearms which had not been registered to him—an offense under § 5861(d); to one who made firearms

without having complied with the requirements of § 5822—an offense under § 5861(f); and for transferring a firearm in violation of § 5812—an offense under § 5861(e). See, United States v. Schultzler, 309 F.Supp. 681 (S.D.Ohio, Oct. 9, 1969); United States v. Schofer, 310 F.Supp. 1292 (E.D.N.Y. Dec. 15, 1969) (Dooling, J.).

The *Schultzler* decision upheld the constitutionality of subdivisions (d) and (f) of § 5861 and ruled that they do not compel the defendant to incriminate himself in violation of the Fifth Amendment.

The *Schofer* case involved one count under subdivision (d) and one count under subdivision (e) of § 5861. The count relating to a transferee-possessor [§ 5861(d)] was sustained as not involving a possible violation of the privilege. The Court also was of the view that the provision of the statute relating to a maker-possessor does not conflict with the privilege. The count relating to unlawful transfer, [§ 5861(e)] was dismissed as violative of the privilege on the ground that "Section 5848 appears inadequate in failing to take account of what was said in Marchetti, 390 U.S. at 53–54, 88 S.Ct. 697, 19 L.Ed.2d 889, about the effect of significant enhancement of 'the likelihood of * * * prosecution for future acts'."

This Court agrees with the view that § 5861(c), relating to illegal possession, poses no problem under the Fifth Amendment. That is the section under which counts 12–23 are drawn.

In Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), the Supreme Court held that a proper claim of privilege against self incrimination was a full defense to prosecutions for either failure to register a firearm under former § 5841 of Title 26, or for possession of an unregistered firearm under former § 5851 of Title 26. The statutory scheme then in force worked in the following manner: Not every possessor of a firearm had to register. One who made the firearm in compliance with the statute, or who acquired it by transfer in compliance with the statute did not have to register. If the statutory requirements respecting making or transfer were not met, then one who possessed a firearm had to fill out a form. 26 U.S.C. § 5841.

As the Supreme Court stated in *Haynes*, at 96–97, 88 S.Ct. at 730:

> The registration requirement is thus directed principally at those persons who have obtained possession of a firearm without complying with the Act's other requirements, and who therefore are immediately threatened by criminal prosecutions under §§ 5851 and 5861. They are unmistakably persons "inherently suspect of criminal activities." (citation omitted) * * * [T]he correlation between obligations to register and violations can only be regarded as exceedingly high, and a prospective registrant realistically can expect that registration will substantially increase the likelihood of his prosecution. Moreover, he can reasonably fear that the possession established by his registration will facilitate his prosecution under the making and transfer clauses of § 5851. * * * [y]et they are compelled, on pain of criminal prosecution, to provide to the Secretary both a formal acknowledgment of their possession of firearms, and supplementary information likely to facilitate their arrest and eventual conviction.

The present statute is different in several important respects.

Firstly, as presently written the statute is no longer aimed at classes of firearms peculiarly identified with unlawful activities. The statute requires registration of firearms which are characteristically owned by law-abiding citizens. The duty to register attaches to manufacturers, importers, transferors and makers of firearms. The purpose was such that any possessor of any firearm will be identifiable from the Central Registry if the law has been complied with.

Secondly, under the old statute, one who was a possessor-transferee who was in violation of the statute because he had not issued the required order form, or a possessor-maker, who had not filed the required notification of future making, was under a duty to register. If he did not register, he was indictable for failure to register as a mere possessor. If he chose to register in order to comply with the law, his registration disclosed his prior criminal neglect. The new statute does not have this effect.

A transferee under the new statute does not have to fill out an order form. The transferor must secure a form, and it is unlawful for the transferee to take possession unless the Treasury Department has approved the transfer and registration of the firearm. So too, under the present statute, the maker must obtain permission to make firearms before doing so, but one acquiring a firearm from a maker, is a transferee who has no obligation to register, but is in violation of the law if he possesses firearms which have been unlawfully made. But he has no duty, as possessor or transferee to register the firearms. His acceptance of possession knowing them to have been unlawfully made, places him in immediate violation of § 5861(c).

Similarly, under the Gun Control Act of 1968, one who makes a firearm in violation of the making provisions, and who retains possession is not required to do any act which would incriminate him; he is not as a possessor under a duty to register and disclose his earlier default. Indeed, his application to legitimatize his possession would be denied. § 5822. He would be indictable, however, for both the violation based on non-compliance with the making provisions (§ 5822) and as a possessor of a firearm made unlawfully. § 5861(c).

This analysis is supported by a recent Supreme Court decision in Minor v. United States, 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969) which rejected a Fifth Amendment challenge to a conviction for selling narcotic drugs without the written order forms required by 26 U.S.C. § 4705(a). The defendant was convicted of selling narcotics to a buyer who did not have the official order form required by law. The Court noted that the vice in the statutes involved in *Leary, supra, Marchetti, supra,* and *Grosso, supra,* "stemmed from the dilemma which confronted the buyer * * * all he had to do to avoid the federal penalty was to secure the form and pay the tax. But to exercise that option and avoid the federal penalty, he was forced to incriminate himself under other laws." 396 U.S. at 92, 90 S.Ct. at 287. But in *Minor,* "the first horn of this dilemma does not confront the seller. In the face of a buyer's refusal to secure the order form, the option of making a legal sale under federal law is foreclosed by the buyer's decision, and 'full and literal compliance' with the law by the seller means simply that he cannot sell at all". 396 U.S. at 92–93, 90 S.Ct. at 287.

In *Leary,* on the other hand, the buyer of drugs "was presented with the possibility of both purchasing and complying with the federal law, if he would only incriminate himself". 396 U.S. at 93 n. 4, 90 S.Ct. at 287.

As in *Minor,* the defendant herein, could only comply with the law by not possessing the contraband. He did not have the option of complying with the law if he would only incriminate himself.

The moment anyone makes a bomb, without complying with the making provisions—he is in violation of the making provisions, and of the provision making it unlawful to possess a firearm knowing it to have been unlawfully made. After the initial criminal unlawful making, a defendant can no longer in any way cure his illegal acts. The statute does not provide for registration by one who has unlawfully made and subsequently unlawfully possesses a firearm.

In a memorandum belatedly filed, the defendant adds the suggestion that he could not comply with § 5822 (making) without incriminating himself on Canadian bombing occurrences. It is ques-

**784**

tionable whether the constitutional privilege relates to acts unlawful in a foreign jurisdiction. At any event, there is nothing in the present record which properly raises this issue at this time.

Accordingly, counts 12–23 of the indictment for possession under the circumstances charged herein are not subject to dismissal on the ground that the defendant is required to do an act which would compel self-incrimination.

### CONCLUSION

The motions of the defendants are each denied in all respects, except as indicated under item 3 as to which a consolidation of the allegations of the counts has been ordered as stated above.

So ordered.