UNITED STATES of America,
Appellee,

v.

Eugene Wesley HOWARD, Appellant.

Nos. 73–1856, 73–1857.

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1974.

Decided Oct. 29, 1974.

Robert G. Duncan, Duncan & Russell, Gladstone, Mo., for appellant.

Wilbur H. Dillahunty, U. S. Atty., Little Rock, Ark., for appellee.

Before GIBSON, Chief Judge, VOGEL, Senior Circuit Judge, and WEBSTER, Circuit Judge.

WEBSTER, Circuit Judge.

Eugene Wesley Howard was convicted on four counts of willfully and knowingly transferring and delivering counterfeit twenty-dollar Federal Reserve Notes, in violation of 18 U.S.C. § 473; on one count of knowingly possessing such counterfeit currency, in violation of 18 U.S.C. § 472; and on one count of

unlawfully carrying a firearm during the commission of a federal felony, in violation of 18 U.S.C. § 924(c)(2). In this appeal he challenges the introduction of allegedly prejudicial evidence at trial as well as several of the trial court's [1] instructions to the jury. Having carefully reviewed the trial transcript and the arguments advanced on appeal, we affirm.

### The Facts

Appellant Howard was introduced to the owner of the Mid-State Printing Co. by Michael Gocke, a former printer at the plant. Howard bought the plant in November, 1972, financing the purchase with money he borrowed from one Bill Carter, a self-proclaimed gambler and narcotics user with a long record of felony convictions. On January 18, 1973, while the building was allegedly being cleaned and prepared for printing, Howard guided Secret Service Agents Saitta and Howlett through the plant at their request. Howard agreed to notify the agents if he discovered any indications of counterfeiting at Mid-State, but he denied knowing Carter when the agents inquired about their possible acquaintance.

In early March of 1973, Carter, who was then on probation for violation of the Firearms Act, agreed to cooperate with the Secret Service and, while wearing an electronic taping device, approached Howard for the purpose of purchasing counterfeit currency from him. Carter had a series of such meetings with Howard and on at least two occasions bought a considerable quantity of counterfeit twenty-dollar Federal Reserve Notes from Howard. During one meeting, Carter was accompanied by Agent Saitta, who had adopted the undercover disguise of a prospective purchaser of additional counterfeit notes. Ultimately, Howard gave Saitta the key to a motel room where 12 counterfeit notes as well as 12 counterfeit Arkansas drivers' licenses were hidden. After taking these samples supposedly for inspection purposes, Saitta agreed to purchase $200,000 worth of the counterfeit currency and 6,000 licenses. As planned, Howard delivered the money and licenses to Saitta at a shopping center parking lot, whereupon Howard was arrested as he was reaching for a loaded pistol in his belt.

Following his arrest, Howard was taken to the local Secret Service office where he agreed to accompany several agents to his mother's house in Lonoke where additional money was hidden. The search of that house disclosed well over $400,000 worth of counterfeit twenty-dollar bills and approximately 6,000 counterfeit Arkansas drivers' licenses. The following day, agents found trash barrels containing scraps of counterfeit money and burned printing plates after searching with a warrant the property near Howard's office in North Little Rock. According to the testimony of one of Howard's employees, he had hauled these trash barrels from the Mid-State plant upon Howard's direction.

Howard was charged with four separate deliveries of counterfeit currency, two to Carter and two to Saitta. He was also charged with selling and possessing the counterfeit money hidden at his mother's house and with unlawfully carrying a firearm during the delivery of the money at the parking lot.

### Evidence of Other Crimes

Howard's first assignment of error relates to the admission into evidence of testimony concerning the counterfeit Arkansas drivers' licenses. Howard argues that he was not standing trial for any offense involving the licenses and that such evidence of other crimes improperly prejudiced his case.

While evidence of other criminal activity is generally inadmissible to show that the accused is an individual of bad

---

1. The United States District Court for the Eastern District of Arkansas, Judge J. Smith Henley.

character with a propensity to commit the crime charged, such evidence may be received for several narrowly defined and exceptional purposes, e. g., to show intent or motive. Umbaugh v. Hutto, 486 F.2d 904 (8th Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1978, 40 L. Ed.2d 311 (1974). Another such exception permits the introduction of evidence of other criminal activity to complete the story of the crime on trial by proving its immediate context or the "res gestae." McCormick, Evidence 448 (2d ed. 1972). Thus, this Circuit has upheld the admission of such evidence where it is "part and parcel" of the crime charged. United States v. Cochran, 475 F.2d 1080, 1082 (8th Cir.), cert. denied, 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973). See also United States v. Weatherford, 493 F.2d 248 (8th Cir. 1974).

■ The evidence in question here clearly fits this latter category. The record shows that Howard offered to sell to undercover agent Saitta the counterfeit drivers' licenses together with the counterfeit currency; in both the motel room where samples of the counterfeit had been secreted and in Howard's mother's house where substantial quantities of counterfeit were hidden, drivers' licenses were found in addition to the currency. Under these circumstances, we hold the evidence concerning the licenses to have been properly admitted. Moreover, Judge Henley's instruction to the jury [2] properly explained the use to which such evidence may be put. We find no error here.

### Howard's Volunteer Defense

■ When Howard took the stand at trial, his primary defense was that his entire course of conduct had been based upon his desire to cooperate with the government by locating and identifying the perpetrators of the counterfeiting scheme. He claimed that he adopted the role of "volunteer" soon after he led the Secret Service agents through the Mid-State plant and that he had "set up" a series of counterfeit deals in an effort to apprehend the "big people" involved in the operation. On appeal, he argues that as a result of his good motives, he lacked the requisite criminal intent for conviction. Nonetheless, it is certainly clear from Howard's testimony that all of the acts for which he was convicted were done intentionally, and we therefore reject Howard's contentions.

■ "Noble motives and pure thoughts cannot bar the conviction of one who admits intentional action which violates the proscriptions of a statute declaring that action criminal * * * ." United States v. Ragsdale, 438 F.2d 21, 26 (5th Cir.), cert. denied, 403 U.S. 919, 91 S.Ct. 2231, 29 L.Ed.2d 696 (1971). This principle is supported by ample authority. See United States v. Mitchell, 463 F.2d 187, 191 (8th Cir. 1972), cert. denied, 410 U.S. 969, 93 S.Ct. 1449, 35 L.Ed.2d 705 (1973); United States v. Malinowski, 472 F.2d 850, 856 (3d Cir.), cert. denied, 411 U.S 970, 93 S.Ct. 2164, 36 L.Ed.2d 693 (1973); United States v. Owens, 415 F.2d 1308, 1315 (6th Cir. 1969), cert. denied, 397 U.S. 997, 90 S. Ct. 1138, 25 L.Ed.2d 406 (1970).

2. Soon after the drivers' licenses were introduced, Judge Henley cautioned the jury as follows:

The Court tells you now, of course, that the defendant is not on trial for having any counterfeit driver's licenses, whether it is one or 6,000, or any other number, and you are not to consider this as evidence of any separate offense for which you might convict him. Now, you may, of course, consider this testimony as a part of the totality of the circumstances and for the purpose of shedding light on the charges with which the defendant is being tried here. You may consider that seizure or the presence of the driver's licenses to the extent that it sheds light on the intent or the purpose with which the defendant did any acts with which he is charged in this case. But, again, the Court admonishes you that he is not being charged for possession or any other offense in connection with the driver's licenses themselves.

Judge Henley's instructions properly set forth the essential elements of the offenses charged and correctly reflected the standards against which the jury had to test Howard's volunteer defense.[3]

## The Firearms Charge

Howard has raised a question of first impression in assigning error to Judge Henley's charge to the jury concerning the offense defined by 18 U.S.C. § 924(c)(2). That statute provides in part that

> [w]hoever * * * carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years.

Howard's challenge focuses on the meaning of the word "unlawfully," as employed in the statute. Judge Henley instructed the jury that the word referred to that which is illegal under Arkansas law. He continued:

> You are instructed that under the relevant Arkansas statute it is a mis-

demeanor for any person to wear or carry in any manner whatever as a weapon any pistol, provided that the Arkansas statute is not to be so construed as to prohibit any person from carrying such pistols as are used in the Army or Navy of the United States when carried uncovered and in the hand, and provided further that the statute is not to be construed as prohibiting the carrying or wearing of a pistol by a person while he is on a journey or on his own premises.[4]

Howard contends that this instruction should have instead referred to that which is illegal under federal law. As a result, he argues, he was denied both due process of law and equal protection of the laws, for he was convicted of a crime not punishable under the laws of the United States.[5]

 We disagree. After extensive research into the legislative history of 18 U.S.C. § 924(c)(2), we conclude that "unlawfully" was intended to refer to the carrying of a gun which is prohibited by *any* law—be it a state law, a federal statute, or a municipal ordinance.[6]

3. Judge Henley stated in part:
 * * * [I]f you find from the evidence beyond a reasonable doubt that the defendant knowingly possessed money that he knew was counterfeit, and that he possessed it with 'intent to defraud,' as that term has been defined to you, or that he wilfully delivered counterfeit money to some other person or persons, knowing that it was counterfeit, and with the intent that such other person or persons pass or use the counterfeit money as genuine, then you may find the defendant guilty on one or more counts of the indictment, even though you may believe that in his actions the defendant was motivated ultimately by a desire to expose the criminal activities of others and bring them to justice.

4. Judge Henley's instruction apparently relied on Ark.Stat.Ann. § 41–4501 (Supp. 1973), which provides:
 Any person who shall wear or carry in any manner whatever, as a weapon, any dirk or sword or spear in a cane, brass or metal knucks, razor, blackjack, billie or

sap, ice pick, or any pistol of any kind whatever, shall be guilty of a misdemeanor. Provided, nothing in this act [§§ 41–4501—41–4506] shall be so construed as to prohibit any person from carrying such pistols as are used in the army or navy of the United States when carried uncovered and in the hand, provided, officers whose duties require them to make arrests, or to keep and guard prisoners, together with persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempt from the provisions of this act. Provided further, nothing in this act shall be so construed as to prohibit any person from carrying any weapon when upon a journey or upon his premises.

5. The issue is material since Howard, who was sentenced to nine years imprisonment for the counterfeiting offenses, was given an additional and consecutive one-year sentence for the firearms conviction.

6. One court, the United States Court of Appeals for the Tenth Circuit, recognized the problem presented by the question raised

The purpose of the amendment to H. R. 17735, which ultimately became 18 U. S.C. § 924(c),[7] was "to persuade the man who attempted to commit a federal felony to leave his gun at home." 114 Cong.Rec., 90th Cong., 2d Sess. 22231 (1968). *See also* United States v. Melville, 309 F.Supp. 774, 777 (S.D.N.Y. 1970). To effectuate this purpose, the statute creates a separate offense for the carrying of a gun during the commission of a federal felony and, at least in the case of second and subsequent violations, imposes a mandatory penalty that is consecutive to that assessed for the commission of the underlying federal felony. United States v. Sudduth, 457 F.2d 1198 (10th Cir. 1972); *see* United States v. Gerard, 491 F.2d 1300 (9th Cir. 1974). During the debates which took place prior to the law's enactment, however, several Congressmen expressed concern that H.R. 17735, as it had been originally proposed, might impose such additional penalties upon policemen or licensed carriers of firearms who, while legally carrying such weapons, committed federal felonies. *See* 114 Cong.Rec., *supra*, at 21788–89, 21792, 22231, 22235,

22237. The word "unlawfully," inserted following "carries," was intended to obviate this possible problem.[8]

Congress' concern for policemen and licensees is indicative of its intention to strengthen the deterrent effect of the statute while exempting from its reach not only those who might legally carry guns under federal law, but also those who might do so under the authority of state or local laws.[9] Thus, we infer that the meaning of "unlawfully" is broad enough to encompass that which is in violation of any firearms law.

█ Applying these conclusions to the instant case, we find Judge Henley's instruction to have been proper. While he might have given the jury *additional* instructions on federal or local firearms laws, he was not bound to do so. Moreover, unlike in United States v. Ramirez, 482 F.2d 807 (2d Cir.), cert. denied sub nom. Gomez v. United States, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973), there are no evidentiary problems in this case.[10] The Arkansas statute referred to in Judge Henley's instruction[11] is broad enough to encom-

here but declined to resolve it. United States v. Sudduth, 457 F.2d 1198, 1202 (10th Cir. 1972).

7. 18 U.S.C. § 924(c) in its entirety reads:
(c) Whoever—
(1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States, or
(2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States.
shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less that one year nor more than ten years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to a term of imprisonment for not less than two nor more than twenty-five years and, notwithstanding any other provision of law, the court shall not suspend the sentence in the case of a second or subsequent conviction of such person or give him a probationary sentence, nor shall the term of imprisonment imposed under this subsection run concurrently with any term of imprisonment imposed for the commission of such felony.

8. Congress rejected a proposed amendment which would have deleted the word "unlawfully." 114 Cong.Rec., *supra*, at 22236, 22245. *See also* United States v. Ramirez, 482 F.2d 807, 814 (2d Cir.), cert. denied sub nom. Gomez v. United States, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973).

9. Under federal law, it is illegal for any person who has been convicted of a felony, dishonorably discharged from the Armed Forces, or adjudged mentally incompetent, or who has renounced his citizenship or is an alien unlawfully in the United States to possess a firearm. 18 U.S.C. Appendix § 1202. 26 U.S.C. § 5861 et seq. defines additional circumstances under which federal law prohibits the possession of firearms. It is clear that Congress did not intend to limit the meaning of the word "unlawfully" in 18 U. S.C. § 924(c) to the prohibitions already expressed in such federal statutes.

10. In *Ramirez, supra,* the Court of Appeals held that the defendant's motion for a judgment of acquittal should have been granted since the government had failed to introduce any evidence showing that the defendant's possession of the firearm in question had itself been unlawful. 482 F.2d at 814.

11. *See* footnote 4 *supra*.

pass the carrying of a firearm by *any* individual in *any* manner, with certain narrowly defined exceptions. The undisputed evidence that Howard was carrying a pistol concealed in his belt during the delivery of the counterfeit to Agent Saitta was sufficient to support his conviction on the firearms charge.[12]

■ In so holding, we reject Howard's contention that this construction of 18 U.S.C. § 924(c)(2) unconstitutionally permits a federal court to convict him for violating a state statute. While the statute requires that the carrying of the firearm must itself be unlawful, United States v. Ramirez, *supra*, 482 F.2d at 815, a violation of a state firearms law (or any other firearms law) is only one element of the offense defined by 18 U.S.C. § 924(c)(2). The other essential element is the concurrent commission of a federal felony, which—as Congress intended—brings the offense within the jurisdiction of the federal courts. *See* United States v. Melville, *supra*, 309 F.Supp. at 777–778. *See also* 114 Cong.Rec., *supra*, at 22231 et seq.

### Prejudicial Evidence

Howard's final assignment of error calls to our attention certain testimony, exhibits, remarks by the prosecution and comments by the trial judge which, he contends, were cumulatively so prejudicial that a new trial is required. Our examination of these matters leads us to a different conclusion.

■ Only one of these challenges merits detailed discussion. Howard argues that tapes of his conversations with Bill Carter, recorded by a device secretly worn by Carter and introduced into evidence by the government lacked a proper foundation, were barely audible, and contained obscene language which unduly prejudiced the jury. The record shows that the prosecution laid a proper foundation for the admission of the tapes through the testimony of Bill Carter and of Agents Saitta and Howlett. While counsel for the defense objected to the introduction of the tapes as illegally obtained evidence,[13] no objections concerning their foundation or authenticity were interposed.

■ Because parts of the recordings were barely audible, only certain portions of the tapes were played before the jury. Howard alleges that this selective playing of the tapes by the prosecution constitutes prejudical error. We disagree. The defense counsel was advised that he could play any tapes not played by the prosecution. Moreover, as we stated on a previous occasion,

> * * * the fact that certain portions of a tape recording are inaudible does not necessarily render the entire tape inadmissible. That question is addressed to the sound discretion of the trial court.
> United States v. Skillman, 442 F.2d 542, 552 n. 8 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971).

We find no abuse of that discretion here. *See also* United States v. Jacobs, 451 F.2d 530, 541–542 (5th Cir. 1971), cert. denied, 405 U.S. 955, 92 S.Ct. 1170, 31 L.Ed.2d 231 (1972).

■ The balance of the claimed errors, including the profanities on the tapes,[14] the remarks of the prosecutor and those of the trial judge, do not rise to the level of reversible error, even when considered on a cumulative basis.

Affirmed.

---

12. Under the Arkansas statute in question, Ark.Stat.Ann. § 41–4501 (Supp.1973), where there is undisputed evidence that the defendant carried the pistol in a concealed fashion, the government need not prove that the pistol was not such as used in the United States army or navy. *See* Blacknall v. State, 90 Ark. 570, 119 S.W. 1119 (1909).

13. Electronic transmittals or recordings made with the consent of one of the parties to the conversation do not violate the Fourth Amendment. United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).

14. *See* Annot., 58 A.L.R.2d 1024, at 1040 § 8 (1958).