UNITED STATES of America, Plaintiff

v.

William Centeno TORRES and Gabino Garcia Pantoja, Defendant.

Crim. No. 94–099(PG).

United States District Court,
D. Puerto Rico.

July 8, 1994.

Juan A. Pedrosa, Asst. U.S. Atty., Hato Rey, PR, for plaintiff.

Miguel Nogueras, Asst. Federal Public Defender, and Edgardo L. Rivera–Rivera, San Juan, PR, for defendant.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

### I.

### Introduction

Defendant Centeno–Torres has been charged with violating 18 U.S.C. § 2119 ("carjacking") and 18 U.S.C. § 924(c)(1) ("possession of a firearm during a crime of violence"). Defendant contends that being sentenced under both statutes would violate his rights under the Double Jeopardy clause of the United States Constitution. Defendant accordingly has moved to dismiss the firearms charge, Count 2 of the indictment (Docket # 18). The Government has opposed defendant's motion (Docket # 23). For the reasons set forth below, defendant's Motion to Dismiss (Docket # 18) is **GRANTED.**

### II.

### Facts

The grand jury indictment and a sworn affidavit by Federal Bureau of Investigation Special Agent Colleen Conyngham contain the following allegations. On April 3, 1994, Juan Kuilan Rivera, Carmen Cacho Melendez, and Cacho Melendez' three year-old daughter were visiting Playa Cerro Gordo in Vega Alta, Puerto Rico. Defendants William Centeno Torres and Gabino Garcia Pantoja, one of whom possessed a firearm, approached Kuilan Rivera, Cacho Melendez, and Cacho Melendez' daughter, and ordered Cacho Melendez to place her daughter in Cacho Melendez' automobile. Defendants

then ordered Kuilan Rivera and Cacho Melendez at gunpoint to enter Kuilan Rivera's automobile. Defendants drove away in Kuilan Rivera's automobile, holding as hostages Kuilan Rivera and Cacho Melendez. After driving several miles, defendants permitted Cacho Melendez to exit the automobile. After driving further and threatening Kuilan Rivera with death, defendants permitted Kuilan Rivera to exit the automobile, possibly firing two shots at Kuilan Rivera.

On April 4, 1994, Kuilan Rivera identified defendants as the perpetrators of the acts of the previous day. On April 5, 1994, Kuilan Rivera's automobile was recovered.

On April 13, 1994, the grand jury returned an indictment charging both defendants in connection with the incident. The indictment charged that both defendants violated 18 U.S.C. § 2119 and 18 U.S.C. § 924(c).

### III.

### Discussion

### A.

### The evolution of today's controversy

In 1968, Congress amended the then-recently-enacted Gun Control Act, Pub.L. 90–351, prohibiting the use of a firearm during the commission of "any felony." Pub.L. 90–618, 82 Stat. 1223 [codified at 18 U.S.C.

§ 924(c) ]. The amended statute authorized federal courts to sentence a gun-toting felon to a term of one to ten years in addition to the sentence imposed for the underlying felony.[1]

In cases decided in 1978 and 1980, the Supreme Court held that where a defendant had violated § 924(c) in conjunction with the commission of a felony that provided an increased or "enhanced" sentence for use of a firearm, the statute did not authorize courts to impose a sentence under § 924(c).[2] *Simpson v. United States,* 435 U.S. 6, 16, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978); *Busic v. United States,* 446 U.S. 398, 404, 100 S.Ct. 1747, 1752, 64 L.Ed.2d 381 (1980) ("[P]rosecution and enhanced sentencing under § 924(c) is simply not permissible where the predicate felony statute contains its own enhancement provision.").

In 1981, a Senate bill included a proposed amendment to § 924(c).[3] The amendment would have prohibited application of the section "where the underlying offense is one involving the use or possession of a weapon...." S.Rep. No. 307, 97th Cong., 1st Sess. 890.[4] The proposal was not adopted.

The present version of the law is the result of modifications of § 924 enacted by Congress in 1984.[5] Pub.L. 98–473. In new sec-

---

1. According to the original text of § 924(c),

    Whoever—
    (1) uses a firearm to commit any felony for which he may be prosecuted in a court of the United States, or
    (2) carries a firearm unlawfully during the commission of any felony for which he may be prosecuted in a court of the United States, shall, in addition to the punishment provided for the commission of such felony, be sentenced to a term of imprisonment for not less than one year nor more than ten years....
    Thus, for example, defendants who used firearms in "conspir[ing] to sell a narcotic drug not in pursuance of a written order," in violation of 26 U.S.C. § 7237(b), were sentenced to five years of imprisonment for committing the drug-related offense, and received a one-year suspended sentence and three years probation in addition, for using the firearm. *United States v. Bradley,* 455 F.2d 1181, 1184 n. 1–2 (1st Cir.) *cert. granted by Bradley v. United States,* 407 U.S. 908, 92 S.Ct. 2438, 32 L.Ed.2d 682 (1972) *judgment aff'd by Bradley v. United States,* 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973).

2. Offenses proscribed by statutes which provide for increased or "enhanced" punishment if a firearm is used during a violation of the statute hereinafter sometimes will be described as "enhancement offenses."

3. The proposed amendment related to offenses which include as an element possession of a firearm. These offenses will be described elsewhere in this opinion as "element offenses."

4. The Senate Report pointed out that "[w]here ... the nature of the offense itself involves using or possessing a weapon, the factor of potential danger to life has already been taken into account, and there is no reason to permit the pyramiding of offenses and punishment through application of this section." S.Rep. No. 307, 97th Cong., 1st Sess. 890.

5. The statute also was amended in 1986, 1988, and 1990. *See* Pub.L. 99–308, § 104(a)(2)(A–E); Pub.L. 100–690 §§ 6460, 7060(a); Pub.L. 101–647. The modifications wrought by these amendments do not bear on the issues addressed by this opinion.

tion 924(c)(1) [hereinafter the "firearms statute"], the law mandates imposition of a determinate period of imprisonment of five years, in addition to a sentence imposed for a predicate crime. The rewritten law applies to "any crime of violence," rather than to "any felony," as in the 1968 version of the law. In addition, Congress responded to *Simpson* and *Busic* by extending explicitly the applicability of the law to crimes of violence which "provide ... for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device...."[6]

In 1992, Congress enacted the Anti Car Theft Act, including § 101(a), the "carjacking" statute. 18 U.S.C. § 2119. The statute sets forth a sentence of imprisonment for whoever "... possessing a firearm ... takes a motor vehicle ... from the person or presence of another by force and violence or by intimidation, or attempts to do so...." 18 U.S.C. § 2119.

Defendant has been charged with violating both the firearms law and the carjacking law. He contends that the firearms law is, in effect, an element of the carjacking law, and that the Double Jeopardy clause protects him from being charged and sentenced under both.

### B.

#### Double Jeopardy Clause

■ The Double Jeopardy clause of the Fifth Amendment of the United States Constitution limits the government's power to prosecute and sentence criminal defendants.[7] The Double Jeopardy clause prohibits the government from, *inter alia*, subjecting a defendant to multiple punishments for the same offense. *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), *overruled in part on other grounds, Alabama v. Smith*, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). This protection for criminal defendants constrains the judiciary to act in accordance with the expressed will of the legislature. *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983) ("With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."); *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981) ("[T]he question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed."). The Supreme Court has held, however, that a legislature may authorize the imposition of multiple punishments. *Hunter*, 459 U.S. at 368–69, 103 S.Ct. at 679. Thus, the legislature, but not the judiciary, may cause a criminal defendant to be twice—or thrice, or more—punished for the same conduct. *Hunter*, 459 U.S. at 370–71, 103 S.Ct. at 680 (Marshall, J., dissenting).[8]

■ Analysis of defendant's Double Jeopardy argument requires a two-step inquiry.

6. In pertinent part, 18 U.S.C. § 924(c) provides:
   (1) Whoever, during and in relation to any crime of violence ... (including a crime of violence ... which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence ... be sentenced to imprisonment for five years....
   * * * * * *
   (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and—
   (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
   (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

7. In pertinent part, the Fifth Amendment provides "[n]o person shall ... be subject for the same offense to be twice put in jeopardy of life and limb...." U.S. Const., 5th Amendment.

8. I believe that Justice Marshall, in dissent, had the better of the argument in *Hunter*. I am particularly troubled by the delegation of authority from the Judicial to the Legislative branch inherent in the Supreme Court's holding that Congress' clear intent may trump the Constitutional rights protected by the Double Jeopardy clause. *See Hunter*, 459 U.S. at 374, 103 S.Ct. at 682 (Marshall, J., dissenting) ("[T]he Double Jeopardy Clause limits the power of all branches of government, including the legislature....").

First, I must apply the so-called *"Blockburger* test" to determine if the two statutes at issue enjoin identical conduct. *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Under *Blockburger,* statutes are said to punish different conduct where "each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182 [citation omitted]. If the statutes proscribe different conduct, defendant's Double Jeopardy rights are not violated. If the statutes proscribe identical conduct, I move to the second step of the analysis. At this stage, I explore Congress' intent with respect to multiple punishments. I must find that defendant's Double Jeopardy rights are violated unless Congress clearly intended to authorize multiple punishments under the two statutes. *See Hunter,* 459 U.S. at 368–69, 103 S.Ct. at 679 ("Where ... a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger,* a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.").

### C.

### *18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2119 "fail" the "Blockburger test".*

■ I apply the *"Blockburger* test" to gauge whether conviction under multiple statutes would cause imposition of multiple punishments for the same offense. I agree with the numerous courts that have found that 18 U.S.C. § 2119 and 18 U.S.C. § 924(c)(1) punish the same conduct, and that conviction under the latter statute does not require proof of any fact additional to those required for conviction under the former. *See, e.g., United States v. Singleton,* 16 F.3d 1419, 1422–25 (5th Cir.1994); *United States v. Hill,* 853 F.Supp. 1154, 1156–58 (N.D.Cal.1994); *United States v. Sabini,* 842 F.Supp. 1448, 1451 (S.D.Fla.1994); *United States v. Harwood,* 834 F.Supp. 950, 951–52 (W.D.Ky.1993), *aff'd* 25 F.3d 1051 (6th Cir. 1994); *United States v. Moore,* 832 F.Supp. 335, 336–37 (N.D.Ala.1993); *United States v. Smith,* 831 F.Supp. 549, 551 (E.D.Va.1993). *Contra United States v. Payne,* 841 F.Supp.

810, 813–14 (S.D.Ohio 1994); *United States v. Zukinta,* 830 F.Supp. 418, 421 (E.D.Tenn. 1993). The conduct punishable under 18 U.S.C. § 924(c)(1) is an element of the proof required under 18 U.S.C. § 2119. To be more explicit, one can not violate the "carjacking" statute without also violating the firearms statute. Therefore, 18 U.S.C. § 2119 and 18 U.S.C. § 924(c) "fail" the *"Blockburger* test."

### D.

### *Congress did not clearly intend to authorize cumulative punishments under 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2119.*

■ Where two statutes "fail" the *"Blockburger* test," "a presumption arises that Congress intended only a single punishment." *Singleton,* 16 F.3d at 1425 (citing *Whalen v. United States,* 445 U.S. 684, 692, 100 S.Ct. 1432, 1438, 63 L.Ed.2d 715 (1980)). Thus, the statutes may not both be the basis of punitive sanctions unless Congress "specifically authorizes" courts to impose multiple punishments. *Hunter,* 459 U.S. at 369, 103 S.Ct. at 679. *See Whalen,* 445 U.S. at 692, 100 S.Ct. at 1438 ("[W]here two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent.").

Numerous federal district and appeals courts have held that Congress "clearly indicated an intent" to authorize cumulative punishments for violators of 18 U.S.C. § 2119 and 18 U.S.C. § 924(c)(1). *See, e.g., United States v. Mohammed,* 27 F.3d 815 (2d Cir. 1994); *United States v. Johnson,* 22 F.3d 106, 108 (6th Cir.1994); *Singleton,* 16 F.3d at 1429; *United States v. Roman Hernandez,* 849 F.Supp. 150, 154 (D.P.R.1994); *United States v. Ford,* 844 F.Supp. 1092, 1095 (D.Md.1994); *Sabini,* 842 F.Supp. at 1452; *Harwood,* 834 F.Supp. at 952; *Zukinta,* 830 F.Supp. at 420. *Contra Hill,* 853 F.Supp. at 1157–60; *Moore,* 832 F.Supp. at 337 (no indication of Congressional intent to impose cumulative punishments); *Smith,* 831 F.Supp. at 551 (same); *United States v. McHenry,* 830 F.Supp. 1025, 1029 (N.D.Ohio 1993) (same). Several of these courts have acknowledged a degree of uncertainty as to Congress' intent, and have expressed reservations about finding that Congress clearly

intended to authorize cumulative punishments under 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2119. *See, e.g., Singleton,* 16 F.3d at 1425 ("[T]he issue is not free from doubt...."); *Id* at 1429 ("This is a close case and we do not consider the analysis we have given of §§ 2119 and 924(c) to be the only one a reasonable mind could accept."); *Harwood,* 834 F.Supp. 950, 952–53 (W.D.Ky.1993) ("The arguments advanced by Defendant in his Motion to Dismiss are not easily brushed aside ... [T]he question is certainly a close one."). *Contra Zukinta,* 830 F.Supp. 418, 420 ("[T]he legislative intent of Congress is absolutely clear in the language of 18 U.S.C. § 924(c).").

■ I agree that it is difficult to discern Congress' intent with respect to the statutes at issue today. Unlike so many of my colleagues who have addressed this issue, however, I believe the text and legislative history of 18 U.S.C. § 924(c)(1) reflect Congress' wish that the firearms statute not be applied where use or possession of a firearm is an element of the underlying offense.[9] I am convinced, therefore, that Congress did not in the 1968 enactment of the firearms statute or in the 1984 amendment to the statute satisfy the standard set out in *Hunter.* I

believe, in other words, that Congress did not in 1968 or 1984 "specifically authorize" the imposition of multiple punishments for violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2119 or any other "element offense."[10]

It is true that the original version of the statute was applicable, on its face, to a person who committed "any felony." The present version of the statute applies, on its face, to a person who commits "**any** crime of violence." Nevertheless, for the reasons discussed in the remainder of this opinion, I find that the statute does not apply to "element offenses."

With the exception of a failed 1981 proposal to amend the firearms statute, neither the text nor the legislative history of § 924(c)(1) contain any mention of offenses which include possession of a firearm as an element. It is possible that Congress' silence indicates that "element offenses" were not in Congress' contemplation when the firearms statute was enacted and amended. It also is possible that Congress **intentionally excluded** "element offenses" from the coverage of § 924(c)(1). What is not possible, however, is that Congress' silence constitutes a "clear indication of intent" that violators of element

9. The Government argues that Congress' intent to authorize cumulative punishments under 18 U.S.C. §§ 924(c)(1) and 2119 is expressed in the text and legislative history of § 924(c)(1), but does not argue that § 2119 provides similar clues. Similarly, I find that § 2119 does not provide guidance as to Congress' intent. *See Hill,* 853 F.Supp. at 1157–58 ("Neither the plain language nor the legislative history of the carjacking statute clearly authorizes cumulative punishment."). The remainder of this opinion, therefore, is devoted to analysis of § 924(c)(1).

10. The courts that have addressed this issue uniformly have applied a "clear intent" standard, evaluating § 924(c)(1) in terms of whether Congress "clearly intended" to authorize multiple punishments. This language appears to be derived from *Albernaz* and *Whalen. See Albernaz,* 450 U.S. at 344, 101 S.Ct. at 1145; *Whalen,* 445 U.S. at 692, 100 S.Ct. at 1438. I believe that review of the permissibility of cumulative punishments is governed by the "specifically authorized" standard set forth in *Hunter.*

The standard set out in *Hunter* was, of course, presaged by the Supreme Court's statements in *Albernaz* and *Whalen.* As Justice Marshall's dissent in *Hunter* points out, however, the Supreme Court did not hold squarely in *Albernaz* or *Whal-*

*en,* that Congress could impose multiple punishments for identical offenses proscribed under two or more statutes. The standard derived from *Albernaz* is dicta in that case, because the Court held that the two crimes at issue did not proscribe the same conduct. In *Whalen,* the Court held that courts *could not* impose multiple punishments in the absence of a clear statement by Congress, but "had no occasion to decide, and it did not decide, whether multiple punishment for [two crimes that proscribe the same conduct] *can* be imposed if clearly authorized by the legislature." *Hunter,* 459 U.S. at 371 n. 3, 103 S.Ct. at 680 n. 3 (Marshall, J., dissenting) (emphasis in original).

As demonstrated below, the Supreme Court's precedents suggest that a "clear intent" standard in fact requires an explicit indication in the text or legislative history that a disputed item is covered. Thus, the application of the "clear intent" standard applied by the court in *Singleton, inter alia,* becomes a search for an express statement that probably would satisfy the "specifically authorized" standard set forth in *Hunter.* Because I believe that the "clear intent" standard of *Albernaz* and *Whalen* and the "specific ... authoriz[ation]" standard of *Hunter* are equivalent when applied, and because I believe that § 924(c)(1) satisfies neither, I will refer to both throughout this opinion.

offenses be subject to cumulative punishments, or a "specific ... authoriz[ation]" to courts to impose such punishments.

### 1.
### What does the Supreme Court mean when it imposes a "clear intent" or "clear statement" requirement?
#### a.
### Legislative intent vs. textual meaning

Where statutory interpretation focuses on legislative intent, statutes are viewed as "commands that emanate from the legislative branch," and the judiciary's role "is limited to deciphering these commands and applying them to particular cases." [11] Courts may consider information derived from a variety of sources, including legislative reports and the record of floor debate relating to the enactment of the statute at issue.[12] "[A] number of Supreme Court opinions state that original legislative intent is the touchstone for statutory interpretation." [13]

Justice Antonin Scalia, however, has in his opinions and scholarly works been a leading voice for "new textualism," whose adherents are found within the academy and judiciary.[14] "New textualists" seek to eliminate courts' reliance on legislative history and to eliminate courts' searches for legislative intent.[15] "New textualism" emphasizes—indeed exalts—statutory language as the only legitimate source of guidance for courts: a statute means just what it says, and nothing more.[16]

According to a new textualist approach, interpretation of §§ 924(c)(1) and 2119 should focus entirely on the language and meaning of the statutes' texts, rather than Congress' "intent" when the laws were enact-

11. Today's quest for Congress' intent with respect to the applicability of § 924(c)(1) emerges from the Court's frequent reliance on "originalism," a "traditional ... approach to statutory interpretation." Martin H. Redish and Theodore T. Chung, *Democratic Theory and the Legislative Process: Mourning the Death of Originalism in Statutory Interpretation*, 68 Tul.L.Rev. 803, 804–05 (1994).

12. *See* William N. Eskridge, Jr., and Philip P. Frickey, *Statutory Interpretation as Practical Reasoning*, 42 Stan.L.Rev. 321, 327 (1990).

13. *Id.* at 326 n. 14 (citing *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 452–55, 109 S.Ct. 2558, 2565–67, 105 L.Ed.2d 377 (1989); *Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989); *Commissioner v. Engle*, 464 U.S. 206, 214, 104 S.Ct. 597, 602, 78 L.Ed.2d 420 (1984)).

14. *See* Nicholas S. Zeppos, *Justice Scalia's Textualism: The "New" New Legal Process*, 12 Cardozo L.Rev. 1597, 1598–99 n. 10–13 and accompanying text (1991).

15. *See* Cass R. Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv.L.Rev. 405, 429 n. 85 and accompanying text (1989) ("Justice Scalia ... has expressed considerable doubt about legislative intent in general and legislative history in particular.") (citing *inter alia Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527–28, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring in the judgment); *United States v. Stuart*, 489 U.S. 353, 369–77, 109 S.Ct. 1183, 1193–97, 103 L.Ed.2d 388 (1989) (Scalia, J., concurring in the judgment); *Blanchard v. Bergeron*, 489 U.S. 87, 97–100, 109 S.Ct. 939, 946–48, 103 L.Ed.2d 67 (1989) (Scalia, J., con- curring in part and concurring in the judgment); *United States v. Taylor*, 487 U.S. 326, 344–46, 108 S.Ct. 2413, 2423–24, 101 L.Ed.2d 297 (1988) (Scalia, J., concurring in part)).

16. "New textualists" advance numerous arguments decrying the very concept of "legislative intent" and the use of legislative history as an aid in statutory interpretation. *See* Note, *Looking It Up: Dictionaries and Statutory Interpretation*, 107 Harv.L.Rev. 1437, 1441–42 (1994); William N. Eskridge and John Ferejohn, *The Article I, Section 7 Game*, 80 Geo.L.J. 523, 551 (1992) ("[T]he Court's longstanding use of legislative history to interpret ambiguous statutes came under intense criticism in the 1980s from within the judiciary itself."). The Supreme Court itself has "[i]n recent years ... been divided about the significance of legislative intent and legislative history." Sunstein, *supra*, 103 Harv.L.Rev. at 429. Critics convincingly have argued that it is misleading to ascribe to a bicameral institution comprised of 535 individuals a single mental state. *See* Eskridge and Frickey, *supra*, 42 Stan. L.Rev. at 326. *But see* Redish and Chung, *supra*, 68 Tul.L.Rev. at 874–75 (1994). Others have pointed out that Congress enacts and the President signs only the text of a law, which does not include the law's legislative history. These critics argue that the "presentment" clause of Article I, section 7 of the Constitution accordingly prohibits reliance on legislative history as a source of law. *See* Eskridge and Ferejohn, *supra*; Alex Kozinski, *My Pizza With Nino*, 12 Cardozo L.Rev. 1583, 1588 (1991). Still others have demonstrated that Congresspeople and even their legislative staffers impose on the text and legislative history of many statutes biases and opinions not necessarily shared by other members of Congress. *See*

ed. Nonetheless, although Justice Scalia and his supporters and critics have enjoyed an earnest and wide-ranging debate about statutory interpretation, Justice Scalia does not appear to have succeeded in unifying the Supreme Court on the issue.[17] "Commentators have found a statistically small shift in the Court's use of plain meaning methodology over the last few terms.... [T]he numbers are too small and the shifts too minor to argue that a major change has taken place."[18] Therefore, notwithstanding the increasing sway of text-based arguments, I am constrained by Supreme Court precedents applying the Double Jeopardy clause to attempt to reconstruct Congress' intent with respect to authorizing multiple punishments under 18 U.S.C. § 2119 and 18 U.S.C. § 924(c)(1). *See Hunter,* 459 U.S. at 368–69, 103 S.Ct. at 679; *Albernaz,* 450 U.S. at 344, 101 S.Ct. at 1144; *Whalen,* 445 U.S. at 692, 100 S.Ct. at 1438. Thus, I set forth below several examples of the Court's "clear statement" jurisprudence, as a prelude to determining Congress' intent with respect to the applicability of § 924(c)(1).

#### b.

*Congress' intent is not "clear" where the text of the statute does not include an explicit reference to the issue in dispute and the legislative history of the statute does not rectify the ambiguity of the text.*

The Supreme Court held in 1978 that under the then-current language of 18 U.S.C. § 924(c), a district court was not authorized to impose punishment under both the firearms statute and the enhancement provision of 18 U.S.C. § 2113(d), the federal bank robbery statute. *Simpson v. United States,* 435 U.S. 6, 16, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978). Two years later, the Court held that § 924(c) could not be applied at all to a defendant sentenced under the "enhancement" provision of 18 U.S.C. § 111, prohibiting the assault of a federal officer. *Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980).[19] Thus, in exploring the scope of the precursor of the firearms statute at the center of today's controversy, the Court held that Congress' intent to impose multiple punishments where an "enhancement statute" was violated was not clear.

The Court in *Simpson* looked first to the legislative history of the firearms statute, without explicitly acknowledging the existence of ambiguity in the statute's text. 435 U.S. at 13, 98 S.Ct. at 913. In *Busic,* however, the Court expressly found that the text of § 924(c), which on its face applied to *"any felony,"* was ambiguous and did not reveal Congress' intention with respect to the applicability of the statute.

> By its terms, [§ 924(c)] tells us nothing about the way Congress intended to mesh the new enhancement scheme with analo-

---

David Williams, *Legitimation and Statutory Interpretation: Conquest, Consent, and Community in Federal Indian Law,* 80 Va.L.Rev. 403, 437 (1994) (attributing this view to Justice Scalia) [footnote and citation omitted]; Kozinski, *supra.* In general, the "new textualists" fear that legislative history is infinitely malleable, and may be used to support any conclusion, giving judges an inappropriate role in lawmaking. *See* Williams, *supra,* 80 Va.L.Rev. at 437.

17. *See* Redish and Chung, *supra,* 68 Tul.L.Rev. at 804–06, and 812 n. 27. Redish and Chung criticize "new textualism," suggesting that the approach "is either wrong or not 'new' at all." *Id.* at 819 n. 62; *see id.* at 825–31.

18. Jerry L. Mashaw, *Textualism, Constitutionalism, and the Interpretation of Federal Statutes,* 32 Wm. & Mary L.Rev. 827, 833 (1991).

19. The Court decided *Simpson* in 1978, several years prior to deciding *Whalen* (1980), *Albernaz* (1981), and *Missouri v. Hunter* (1983). The

Court's approach in *Simpson* to determining whether § 924(c) authorized cumulative punishments, therefore, was not informed or controlled by the standards set forth in the latter cases. Nonetheless, the Court in *Simpson* appeared to search for a "clear and definite legislative directive" authorizing cumulative punishments under § 924(c) and 18 U.S.C. § 2113(d). 435 U.S. at 15–16, 98 S.Ct. at 914. *Busic,* moreover, was decided approximately one month following the decision in *Whalen,* in which the Court stated in dicta that "where two statutory provisions proscribe the 'same offense,' they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent." *Whalen,* 445 U.S. at 692, 100 S.Ct. at 1438. I look for guidance, then, from the Court's approach in *Simpson* and *Busic,* where the Court explored the scope of the coverage of the precursor of the firearms statute under which defendant has been charged.

gous provisions in pre-existing statutes defining federal crimes.... Plainly, the text of the statute fails to address the *issue pertinent to decision of these cases*—whether Congress intended (1) to provide for enhanced penalties only for crimes not containing their own enhancement provisions, (2) to provide an alternative enhancement provision applicable to all felonies, or (3) to provide a duplicative enhancement provision which would permit double enhancement where the underlying felony was proscribed by a[n "enhancement"] statute like § 111.

*Busic,* 446 U.S. at 405–07, 100 S.Ct. at 1752–53 (emphasis added).

Thus, the Court defined narrowly the issue as to which it sought to ascertain Congress' intent. The firearms statute could not be applied to statutes that include "enhancement" provisions because the firearms statute did not mention "enhancement" statutes. Reference in the statute's text to "any" felony was not sufficiently specific to demonstrate that multiple punishments were authorized where the predicate felony was an "enhancement offense." The Court refused to presume that Congress intended to authorize cumulative punishments under the firearms statute because the statutory language—according to which the statute was applicable to "any felony"—was "ambiguous." [20]

The Court also looked to the legislative history of the firearms statute. The Court's conclusion was bolstered by reference to a statement by the statute's sponsor during the brief floor discussion of the proposed statute that his proposal was "not intended to apply to" statutes that include enhancement provisions. *Id.,* 435 U.S. at 13, 98 S.Ct. at 913 (quoting 114 Cong.Rec. 22231, 22232 (1968)).

The Supreme Court held, then, that Congress did not in the precursor of the firearms statute authorize courts to impose multiple punishments. Although the statute applied on its face to "any felony," the Court held that the statute did not clearly apply to "enhancement" statutes because the text of the statute did not contain an unmistakable, express statement addressing with specificity the applicability of § 924(c) to enhancement statutes, and because the legislative history of the statute did not overcome the ambiguity of the text. The Court found that neither the text of the statute nor the legislative history authorized the statute's application to "enhancement" offenses.

Because the instant case involves the amended version of the statute at issue in *Simpson* and *Busic,* I must apply the holding of those cases and the Supreme Court's approach to statutory interpretation to assess Congress' intent with respect to multiple punishments for violations of § 924(c)(1) and carjacking. Therefore, notwithstanding the arguments of the "new textualists," I will derive information and clues from both the text and legislative history of § 924(c)(1). I may not find that Congress "clearly intended" to apply the firearms statute to the carjacking statute or other element statutes if the text of the firearms statute does not specifically refer to element statutes and explicitly include element statutes within its coverage, unless the legislative history of the firearms statute clarifies Congress' intent.[21]

---

**20.** The Court thus applied the "oft-cited rule that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *Busic* 446 U.S. at 406, 100 S.Ct. at 1753 (quoting *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971) [citation omitted]).

**21.** Thus, the requirement derived from *Albernaz* and *Whalen* that Congress "clearly indicate its intent" to impose cumulative punishments where statutes proscribe the same conduct appears to be virtually equivalent, in its application, to the "specific authorization" standard set forth in *Hunter.*

The Supreme Court has applied a similarly strict approach in other "clear intent" cases,

notably those in which a Constitutional protection is threatened. For example, in *Kent v. Dulles,* the Supreme Court held that the Secretary of State was not permitted to deny a passport application merely on the basis of the applicant's membership in the Communist Party. 357 U.S. 116, 129, 78 S.Ct. 1113, 1119, 2 L.Ed.2d 1204 (1958). The Court so held despite broad discretion vested in the Secretary by the federal statute and implementing regulations on which the Secretary based his actions. Congress authorized the Secretary to "grant and issue passports ... under such rules as the President may designate...." 357 U.S. at 123, 78 S.Ct. at 1117 (quoting 22 U.S.C. § 211a). In addition, "[t]he Secretary is authorized *in his discretion* to refuse to issue a passport...." 357 U.S. at 124, 78

*See Hill,* 853 F.Supp. at 1158 (noting the "Supreme Court's insistence upon clear, unambiguous authorization for cumulative penalties.") These sources lead to the conclusion that Congress intended that § 924(c)(1) should not apply to statutes, like 18 U.S.C. § 2119, the carjacking statute, that include possession of a firearm as an element of the offense. The sum of the strongest arguments derived from both the text and legislative history, moreover, does not support a conclusion that Congress "clearly indicated [an] intent" to authorize imposition of cumulative punishments under 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2119.

### 2.

***The text of § 924(c)(1) does not demonstrate that Congress "clearly intended" § 924(c)(1) to apply to carjacking or other "element offenses."* [22]**

#### a.

***The text of the firearms statute is ambiguous because the text does not expressly include "element offenses."***

The Supreme Court held in *Simpson* and *Busic* that the facial application of the firearms statute to "any felony" was insufficient to bring within the statute's coverage of-fenses which included "enhancement" provisions. The 1984 amendment unquestionably altered that condition—but only as to offenses which include an enhancement provision. The amended text of § 924(c)(1) is no more specific with respect to "element offenses" than was the statute analyzed by the *Simpson* and *Busic* courts with respect to "enhancement offenses." Neither the original version of the firearms statute nor the present version of § 924(c)(1) mentions offenses committed only where a firearm is used. Therefore, § 924(c)(1) is not sufficiently explicit with respect to coverage of "element offenses" to authorize me to impose multiple sentences in this case.

As in *Busic,* Congress' enactment does not mention the type of statute proscribing the underlying offense for which the Government has charged defendant. Thus, as in *Busic,* the firearms statute is ambiguous.[23] The "rule of lenity," applied where a criminal statute is ambiguous, counsels against imposing multiple punishments in this case. *Busic,* 446 U.S. at 406, 100 S.Ct. at 1752 (citing *United States v. Bass,* 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971)). *See also* Note, *Intent, Clear Statements, and the*

S.Ct. at 1117 (quoting 22 C.F.R. § 51.75) (emphasis added). Nonetheless, the Court held that the Secretary could not act in derogation of the Constitutional right to travel—"part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment," 357 U.S. at 125, 78 S.Ct. at 1118—unless Congress authorized him in "explicit terms" to do so. 357 U.S. at 130, 78 S.Ct. at 1120. Merely granting the Secretary "discretion" was not a sufficiently clear statement to permit curtailment of a Constitutional right.

The Supreme Court also has applied rigorously a "clear statement" requirement on legislating bodies wishing to abrogate or waive a state's Eleventh Amendment-based sovereign immunity. *Quern v. Jordan,* 440 U.S. 332, 343–45, 99 S.Ct. 1139, 1146–47, 59 L.Ed.2d 358 (1979). An unconsenting state may not be haled into federal court as a defendant in an action based on the provisions of a law that does not *"explicitly* and by clear language indicate on its face an intent to sweep away the immunity of the States...." 440 U.S. at 345, 99 S.Ct. at 1147 (emphasis added). An agency that functions as an "arm of the state," *Metcalf & Eddy v. Puerto Rico Aqueduct & Sewer Authority,* 991 F.2d 935, 939 (1st Cir.1993), may not be sued in federal court

where the legislature by statute has permitted the agency to "sue and be sued." *Culebras Enterprises Corp. v. Rivera Rios,* 813 F.2d 506, 517 (1st Cir.1987). "Where a statutory provision exists allowing a state agency to be sued, it does not necessarily follow that the legislature has waived the eleventh amendment and consented to let the state be sued for money damages not only in a state but in a federal court. A waiver is found only where it is manifest that a waiver *of the eleventh amendment* was intended." *Id.* at n. 9 (emphasis in original) [citation omitted].

**22.** As noted earlier, the government wisely does not argue that Congress clearly expressed its intent in the text or legislative history of 18 U.S.C. § 2119 to authorize multiple punishments under the firearms and carjacking statutes. The government's arguments focus on the text and legislative history of 18 U.S.C. § 924(c)(1), and I confine my exploration to that statute.

**23.** *See also Marathon LeTourneau Co., Marine Div. v. N.L.R.B.,* 414 F.Supp. 1074, 1080 (S.D.Miss.1976) (wide disparity among opinions interpreting statute "shows conclusively" that terms of statute are not clear and unambiguous).

*Common Law: Statutory Interpretation in the Supreme Court,* 95 Harv.L.Rev. 892, 908 (1982) (vagueness is not tolerable in criminal statutes); 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.25 (A narrow meaning will be given to language in a statute that is "penal in nature."). The text of § 924(c)(1), then, does not itself "clearly indicate [Congress'] intent" to authorize multiple punishments under an "element" statute and the firearms statute.[24]

### b.

**The firearms statute may not be applied to the carjacking offense because to do so would render a portion of the firearms statute superfluous.**

■ A court should interpret a statute so that every word of the statute has meaning. "[A]ll parts of a statute, if possible, are to be given effect." *Fidelity Federal Sav. & Loan Assn. v. de la Cuesta,* 458 U.S. 141, 163, 102 S.Ct. 3014, 3027, 73 L.Ed.2d 664 (1982) [citations omitted]. *See also Beisler v. C.I.R.,* 814 F.2d 1304, 1307 (9th Cir.1987) ("We should avoid an interpretation of a statute that renders any part of it superfluous and does not give effect to all of the words used by Congress.") [citation omitted]. As noted earlier, § 924(c)(1) proscribes the "use ... or carr[ying]" of a firearm *"during and in relation to* any crime of violence ..." (emphasis added). The emphasized language would be surplusage if the firearms statute were applied to a carjacking defendant, because a defendant convicted of carjacking by definition has used a firearm "during and in relation to" a crime of violence. The language is not redundant where it is applied to statutes that proscribe other crimes of violence. For example, a defendant charged with violating 18 U.S.C. § 2113, the bank robbery statute, may commit a bank robbery without using or carrying a firearm. Charging this defendant under § 924(c)(1), then, would represent the

first and only time the "during and in relation to" language would have effect. In contrast, there is no need to specify that § 924(c)(1) is applicable where a firearm is used "during and in relation to" a crime of violence, where the "crime of violence" is carjacking, because commission of a carjacking assumes use or possession of a firearm "during and in relation to" the offense. Application of § 924(c)(1) to carjacking and other "element offenses" would render a portion of the firearms statute superfluous.[25]

### 3.

**The legislative history of 18 U.S.C. § 924(c)(1) does not demonstrate that Congress "clearly intended" to authorize imposition of multiple punishments on violators of 18 U.S.C. § 2119 or other offenses which include possession of a firearm as an element.**

Congress' intent in 1968 was to enact a firearms control law that would deter the use of firearms in the commission of crimes. Although Congress undoubtedly acted with the generalized hope that crime itself would diminish, § 924(c) itself was designed to diminish the frequency with which firearms escalated the stakes of criminal activity and transformed "ordinary" felonies into potentially deadly acts. According to Representative Poff, the 1968 sponsor of the original version of the firearms statute, the purpose of the section was "to persuade the man who attempted to commit a federal felony to leave his gun at home." *United States v. Howard,* 504 F.2d 1281, 1286 (8th Cir.1974) (quoting 114 Cong.Rec., 90th Cong., 2d Sess. 22231 (1968)). Representative Poff thus appears to have been referring to crimes that may be committed *without a firearm.* Carjacking, under 18 U.S.C. § 2119, like all other "element offenses," by definition *cannot be committed without a firearm.* The Supreme

---

**24.** As noted earlier, the Court in *Simpson* and *Busic* cited the legislative history of the firearms statute to support the holdings of those cases. The legislative history of § 924(c)(1) also reflects that the statute is ambiguous, at best, with respect to authorizing imposition of multiple punishments under the firearms statute and an underlying "element offense." *See infra* section III.D.3.

**25.** Application of the firearms statute to crimes for which an enhancement provision is applicable also renders § 924(c)(1) superfluous. The 1984 amendment of the firearms statute, however, eliminates any doubt as to whether Congress intended to legislate redundantly with respect to "enhancement" statutes.

Court later observed that § 924(c) was "designed to combat the ... problem [of] the use of dangerous weapons—most particularly firearms—*to commit federal felonies.*" *Simpson*, 435 U.S. at 10, 98 S.Ct. at 911 (emphasis added). *See also id.* at n. 4 ("[T]he overriding purpose of § 924(c) was to combat the use of guns ... *to commit federal felonies.*") (emphasis added). The Court's language suggests a distinction between the "dangerous weapon" or "firearm" and the "federal felonies," and strengthens the conclusion that § 924(c) was targeted at laws, unlike carjacking and other element offenses, that may be violated *without possession of a firearm.*

■ The 1984 Congress recognized and reaffirmed this goal. The Senate Report observes that "the section was directed at persons who *chose* to carry a firearm as an offensive weapon for a *specific criminal act.*" 1984 U.S.C.C.A.N. 3182, 3492 n. 10 (citing *United States v. Howard*, 504 F.2d 1281 (8th Cir.1974)) (emphasis added). The italicized language reflects the existence of a separation and distinction between the criminal conduct and the "offensive weapon" "chose[n]" to assist in the crime's commission. The person at whom this section was "directed" could choose to commit the "criminal act" with or without a weapon. The 1984 Senate Report recognizes that the section was intended to deter the *use of weapons* otherwise inessential to the commission of the underlying crime. A weapon, then, was not an element of the crimes to which this section was intended to apply, but instead a prop that could be carried along or "left at home." 114 Cong.Rec. 22231.

This interpretation is confirmed by the citation of *Howard* as support for the restatement of Congress' intent. In *Howard*, the appellant was convicted of possessing a firearm while committing counterfeiting offenses. 504 F.2d at 1282–83. Howard was arrested after delivering to a Secret Service agent $200,000.00 in counterfeit currency and 6,000 faked Arkansas driver's licenses. *Id.* at 1283. Howard had brought to the delivery site a loaded pistol. The pistol, of course, was unconnected to the underlying offense of counterfeiting; Howard could have been convicted of the underlying offense had he "left [the pistol] at home," but its presence heightened the dangerousness of the offense. Thus, as the 1984 Senate Report points out, application of § 924(c) was appropriate.

■ The objective sought by § 924(c) loosely may be described as making crime safer or "taking the gun out of the crime." This objective is achieved by deterring from using a weapon an individual bent on committing a crime. The person still may commit the crime, but, in theory at least, there is less likelihood that her actions will result in death or serious injury to the victims of the crime or bystanders. This objective is applicable to offenses such as counterfeiting, which do not include a sentence enhancement provision and do not include firearms possession as an element, *see Howard, supra*, and to "enhancement offenses," such as bank robbery; in either instance, a criminal who was convinced to "leave his gun at home" may commit the identical, if perhaps a safer incidence of the same, crime. This scenario is fully in keeping with the objective of § 924(c). A potential carjacker who is deterred from using his firearm, in contrast, no longer is a carjacker. In Puerto Rico, if he steals a car, he will have violated Puerto Rico's robbery statute, P.R.Laws Ann., tit. 33, § 4279 (1992). But he will not have committed carjacking. Thus, application of § 924(c) cannot make carjacking *safer;* if use of a firearm is deterred, the federal felony is not committed. According to Representative Poff, the Supreme Court, and the legislative history of the 1984 amendment, § 924(c) is not applicable unless a federal felony is committed. The stated objective of § 924(c) is applicable to "enhancement offenses," but does not logically fit "element offenses." "The inclusion of [the] element [of possession of a firearm] differs materially from federal offenses which include possession of a firearm not as an element of the offense but as the basis for enhancing penalties." *Hill*, 853 F.Supp. at 1158. An element offense, such as carjacking, is, by definition, a "federal felony," *Simpson*, 435 U.S. at 10, 98 S.Ct. at 911, that cannot be committed *without* a firearm. Until Congress criminalizes as a federal offense ordinary car theft, deterrence

of carjackings will be beyond the limited objective of § 924(c)(1).

It is not surprising, therefore, that the legislative history of the 1984 amendment to § 924(c) contains repeated references to offenses that include *"enhanced ... punishment provisions,"* or permit *"enhanced* sentences" and *"enhanced* punishment," but nowhere alludes to offenses an element of which is possession of a firearm. S.Rep. No. 225, 98th Cong., 1984 U.S.C.C.A.N. 3490, 91–92. The Senate Report lists six statutes to which the rewritten firearms statute was intended to apply: as the report itself points out, all six are "enhancement" statutes. *Id.* at 3491 n. 8 and accompanying text.[26]

In addition, a substantial portion of the Senate Report is devoted to discussing *Simpson* and *Busic,* the cases in which the Supreme Court held that § 924(c) was not applicable where the underlying offense included an *enhancement* provision. The 1984 amendment indeed largely appears to be Congress' effort to remedy the perceived harm wrought by the Supreme Court's decisions in those cases.[27] The Senate Report refers to the "bank robbery statute[28] and assault on a Federal officer statute[29]," which were the subjects of the Supreme Court's decisions in *Simpson* and *Busic,* as statutes "which have their own enhanced ... punishment provisions" and are *"precisely the type* of extremely dangerous offenses" to which the amended statute was intended to apply. Indeed, the special characteristics of element offenses suggest that element offenses are "precisely the type of extremely dangerous offenses" intentionally *not covered* by the firearms statute.

I repeat my belief that the repeated mention in the text and legislative history of statutes with enhancement provisions is logically consistent with the objective of the firearms statute and indeed reflects unequivocally that after the enactment of the amendment, *Simpson* and *Busic* had been overruled; § 924(c)(1) was applicable to offenses with enhancement provisions. Congress' complete and utter silence with respect to the application of § 924(c)(1) to element offenses may reflect Congress' understanding that the objective of the firearms statute is logically incompatible with the nature of offenses which include as an element possession of a firearm. Although Congress' silence may instead reflect Congress' failure to

26. According to the Senate Report, the statutes to which the amended version of § 924(c) was intended to apply *"include* 18 U.S.C. 111, 112, 113, 2113, 2114 and 2231." S.Rep. No. 225, 98th Cong., 1984 U.S.C.C.A.N. 3490, 3491 n. 8. In the context of the Senate Report's repeated references to "enhancement" provisions, I am comfortable assuming that "what is not listed is excluded," 2A Norman J. Singer, *Sutherland Statutory Construction* § 47.23.

27. Judge Wisdom correctly points out that in enacting the 1984 amendment, "Congress was not concerned exclusively with overturning *Simpson* and *Busic....*" *Singleton,* 16 F.3d at 1427. Congress also sought to ensure that conviction under the revised firearms statute would result in a mandatory, determinate sentence that would run prior to the commencement of a sentence imposed for the "underlying or any other offense." 1984 U.S.C.C.A.N. 3491. I respectfully disagree, however, with Judge Wisdom's next contention. The Senate Report, he asserts, "merely use[s] *Simpson* and *Busic* as *examples* of how the judiciary had gone astray in interpreting § 924(c)." 16 F.3d at 1427 (emphasis added). A careful reading of the Senate Report does not unearth support for this contention. The Senate Report does not include language suggesting that the amendment emerged in response to any deci-

sion of the Supreme Court other than *Simpson* and *Busic,* nor is there a perceptible implication that the amendment sought to "cure" any problem in addition to those mentioned in this footnote. In short, the legislative history, like the text of the original and amended statute, simply does not mention a specific element offense or describe the statute's coverage in terms that are suggestive of the peculiar and important characteristics of element offenses in general. Judge Wisdom argues that the legislative history "does not purport to *limit* the application of § 924(c) to statutes containing an 'enhancement' provision for the use of a firearm." 16 F.3d at 1427 (emphasis added). In light of the crucial distinction between enhancement offenses and element offenses that is apparent in the context of the objective of the firearms statute, I am not convinced that Congress' failure to *exclude* element offenses indicates Congress' intent to *include* such offenses. Even less am I convinced that Congress' failure to exclude element offenses from the coverage of the statute is a "specific ... authoriz[ation]" of the sort contemplated by *Hunter.*

28. 18 U.S.C. § 2113.

29. 18 U.S.C. § 111.

consider the applicability of the firearms statute to "element" offenses, that silence certainly is not the "clear indication of ... intent" required by *Whalen* or "specific ... authoriz[ation]" required by *Hunter* without which I may not impose punishment under both 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2119.

The only reference in the legislative history of § 924(c)(1) to "element offenses" appears in connection with the Senate's 1981 rejection of a proposed amendment to the original version of § 924(c). The amendment would have made § 924(c) inapplicable "where the underlying offense is one involving the use or possession of a weapon of the type ... covered [by the statute]." S.Rep. No. 307, 97th Congress, 1st Session 890. The court in *Singleton* finds support in the rejection of the amendment for its belief that Congress intended that 18 U.S.C. § 924(c)(1) be applied to "element offenses." *Singleton,* 16 F.3d at 1427 n. 41. The *Singleton* court reasons that Congress' rejection of the proposed amendment "suggest[s] ... that Congress intended § 924(c) to apply even when use of a deadly weapon was already an element of the predicate offense." *Id.* For several reasons, I believe the court's reliance on Congress' failure to enact the proposal to be misplaced.

■ Congress' failure to enact a law or amend an existing statute carries no weight, for reasons ably expressed by Judge Easterbrook of the Seventh Circuit Court of Appeals.

Proposed legislation can fail for many reasons. Some Members of Congress may oppose the proposal on the merits; others may think it unnecessary and therefore not worth the political capital needed to write the 'clarification' into the statute over opposition; still others may be indifferent, or seek to use the bill as a vehicle for some unrelated change. Congress may run out of time, as a noncontroversial bill sits in a queue while a contentious proposal is debated. No surprise, therefore, that the Supreme Court repeatedly reminds us that unsuccessful proposals to amend a law, in the years following its passage, carry no significance. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 114 [109 S.Ct. 948, 956, 103 L.Ed.2d 80] (1989) [additional citation omitted]. Were it otherwise, one House of Congress could change the meaning of a law by refusing to approve a change in the text. Yet Congress may change the law only by bicameral action, [citation omitted], which implies that the refusal of one chamber to assent to a proposed amendment cannot alter the meaning of the law on which both chambers agreed in prior years.

*N.A.A.C.P. v. Amer. Fam. Mut. Ins. Co.,* 978 F.2d 287, 299–300 (7th Cir.1992), *cert. denied* — U.S. —, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993). Thus, attempting to divine the meaning and import of Congress' inaction is a futile exercise, the results of which are as likely to mislead as enlighten even the most dogged researcher.[30] Indeed,

---

**30.** Even if a single rationale underlying the 1981 proposal's rejection were manifest, and reflected the desire of the 97th Congress that § 924(c) be applicable where a defendant was charged with an "element offense," I may not presume that the 90th and 98th Congresses—which enacted § 924(c) in 1968 and amended it in 1984—shared that intent and interpretation of the law. *See United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.") [citation omitted]; *Valenzuela v. Yeutter,* 988 F.2d 977, 981 (9th Cir.1993) ("A recent congressional enactment is not an indication of an earlier Congress' intent.") (citing *Price, supra* ). *See also Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 758, 99 S.Ct. 2066, 2072, 60 L.Ed.2d 609 (1979) ("It is the intent of the Congress that enacted [the section] ... that controls.") (quoting

*Teamsters v. United States,* 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977)).

Judge Selya cautions that "it would be presumptuous to ignore" in every instance insights into the objective or interpretation of a statute provided by a Congress other than the one that enacted the statute. *Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.,* 978 F.2d 750, 755 (1st Cir.1992). "[T]he value of subsequent legislative history is best decided case by case." *Id.* at n. 7 [citation omitted]. Prior or subsequent legislative history may be informative, for example, where it takes the form of an "explicit congressional pronouncement" explaining a later Congress' view of a law enacted by a predecessor. *Id.* at 755. The 97th Congress, however, merely failed to act on the proposed amendment, and did not explain the cause of its inaction or

I hasten to point out Judge Easterbrook's observation that a proposal may lie dormant because members of Congress believe the proposed change to be nothing more than a "clarification" of the existing law, and undeserving of attention. In the present case, then, it is possible that the members of the 97th Congress ignored the proposed amendment of § 924(c) precisely because they believed that it embodied no more than a restatement of the law as it then existed. For reasons expressed in this section, in fact, I believe this to be a more plausible interpretation of the failure of the 1981 amendment than that offered by the *Singleton* court.

### E.

### Conclusion

Congress did not satisfy the "clear intent" and "specific authorization" standards set out in *Whalen, Albernaz,* and *Hunter.* The text of § 924(c)(1) does not mention offenses, such as carjacking, which include as an element possession of a firearm. The legislative history of the statute similarly does not mention "element statutes." In addition, the objective of the firearms statute appears to be logically inconsistent with the consequences of applying the statute to carjacking and other "element" offenses. Therefore, I cannot say that Congress clearly intended to authorize multiple punishments under 18 U.S.C. §§ 924(c)(1) and 2119.

### IV.

### Conclusion

Defendant has been charged under 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2119. The former statute does not require proof of a fact additional to those required by the latter. Therefore, the statutes proscribe the same conduct and "fail" the *Blockburger* test. Congress did not clearly intend to authorize cumulative punishments under these statutes. Accordingly, I may not sentence defendant under both statutes without violating his rights under the Double Jeopardy clause.

elucidate its perspective of § 924(c). It would be misleading and contrary to settled law, therefore, to superimpose on the 90th and 98th Congresses

**THEREFORE,** defendant's Motion to Dismiss count 2 of the indictment (Docket # 18) is **GRANTED.** Count 2 of the indictment is hereby **DISMISSED.**

**IT IS SO ORDERED.**

motives attributed to the 97th Congress in rejecting the proposed modification of § 924(c).